```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
                                         :
UNITED STATES OF AMERICA                 :
                                         :
          - v. -                         :     08 Cr. 158 (PAC)
                                         :
ANDREW ROSSI,                            :
                                         :
                    Defendant.           :
                                         :
- - - - - - - - - - - - - - - - - - - - x
```

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S PRETRIAL MOTIONS**

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
     of America.

JEFFREY A. BROWN
MARISSA B. MOLÉ
Assistant United States Attorneys
     - Of Counsel -

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
                                         :
UNITED STATES OF AMERICA                 :
                                         :
        - v. -                           :    08 Cr. 158 (PAC)
                                         :
ANDREW ROSSI,                            :
                                         :
                Defendant.               :
                                         :
- - - - - - - - - - - - - - - - - - - - x
```

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S PRETRIAL MOTIONS**

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to defendant Andrew Rossi's pre-trial motions. The motion seeks, principally, 1) dismissal of the indictment; 2) disclosure of co-conspirator statements; 3) disclosure of any <u>Brady</u> material, 4) early disclosure of Jencks Act materials, 5) 404(b) notice, and 6) suppression of any written or oral statements made by the defendant. For the reasons set forth below, the Government respectfully submits that the motions are either meritless, moot, or both, and should be denied in their entirety.

**STATEMENT OF FACTS**

The defendant was charged in a criminal complaint[1] dated September 20, 2007, with violating Title 21, United States Code, Section 856(a)(2), the statute subtitled "maintaining drug-involved premises" and referred to colloquially as the "crackhouse" statute, which makes it illegal to "manage or control a place, either as an owner, lessee, agent, employee, occupant or mortgagee, or to rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully storing, distributing, or using a controlled substance."

The charges arose from "Operation Raw Deal," a nationwide steroid-trafficking investigation conducted by the DEA and other agencies into illegal underground steroid dealers and the "conversion" labs they operate. Prior to the DEA's successful investigation and resulting enforcement operation in the Fall of 2007, most illegal anabolic steroid dealers in the United States purchased raw steroid powder over the Internet from China and "converted" the powder into liquid anabolic steroids for intramuscular injection by syringe, the preferred method of ingestion for bodybuilders illegally abusing anabolic steroids. The "conversion" process, which involves, among other things,

---

[1] Substantially all of the facts set forth herein are also set forth in the complaint.

mixing the powders with various solvents to form a liquid suspension, applying a simple heat source, and filtering the liquid, was and is often carried out in crude, unsanitary clandestine "laboratories," which are often found in garages, bathrooms, basements, warehouses, and commercial storage spaces.

Beginning in early 2007, New York-based DEA agents became aware of an individual ("Coconspirator-1" or "CC-1") operating an underground steroid lab called "Bodiez By Design," which offered illegal anabolic steroids for sale over the Internet, advertising their availability in bulletin boards and chat rooms ostensibly dedicated to bodybuilding.  Using the information posted by "Bodies By Design" in the various chat rooms, undercover DEA agents made a series of controlled purchases of anabolic steroids from the lab, paying by Western Union money transfer as directed by CC-1.  Based on, among other things, surveillance and a review of documents, agents identified CC-1, and also based on surveillance, agents identified a rented commercial storage unit used by that person, which was located in Nanuet, in Rockland County, New York.

The agents obtained records that showed that the Storage Unit was rented by Andrew Rossi, the defendant, in or about January of 2004.  In the rental application, Rossi named CC-1 as an individual who should be permitted access to the Storage Unit.  According to one employee of the storage company

who was interviewed by agents, that employee observed Rossi on three or four occasions entering the building where the storage unit was located.

According to records maintained by the storage company, the numerical key code assigned to Rossi was used to access the premises where the storage unit was located on fourteen separate occasions between January 15, 2007 and March 21, 2007, including at approximately 8:10 a.m. on March 21, 2007, and again at 5:27 p.m. on March 21, 2007.[2]

On March 21, 2007, CC-1 was observed by agents from the Montvale, New Jersey Police Department at an interstate highway rest stop removing boxes from the back of a car and walking in the direction of a garbage dumpster.  According to the officers, when CC-1 appeared to notice the presence of the officers in their marked police car, CC-1 stopped, reversed course, returned to the car, placed the box he was carrying back in the car, got in the car and locked the doors.

Upon being approached by officers, the Owner gave consent to a search of the car, whereupon the officers discovered substances that were later tested and determined to contain anabolic steroids; a number of boxes containing a large quantity of syringes; glass vials containing oils and solvents; rubbing

---

[2] The rental agreement and entry/exit logs for the storage unit have been provided to the defense as Rule 16 discovery.

alcohol; unused UPS shipping boxes; a money counter, and other Steroid-related paraphernalia.  The Montvale PD officers also found numerous identification cards in CC-1's possession which bore the owner's photo but identified the Owner in various different names.  A subsequent subpoena to Western Union revealed thousands of dollars of payments made by Western Union money transfer to CC-1 in the name of one of the aliases used in the identifications recovered from the Owner on March 21, 2007.

The Montvale PD officers ran a New York Department of Vehicles check on the car being used by CC-1, and determined that the car was registered in the name of a woman subsequently identified as the mother of Andrew Rossi, the defendant.  On March 21, 2007, after the events described above occurred, reported voluntarily to the Montvale Police Department, was read his rights, signed a Miranda waiver form, and spoke with the officers regarding CC-1 and the storage unit.

Rossi claimed that he had originally rented the storage unit at CC-1's request, but could not explain why he had done so or why CC-1 had not rented the storage unit himself. ROSSI claimed that he only first became aware of the contents of the storage unit when CC-1 called him the previous night, in a panic, because CC-1 had received a telephone call in which the caller told CC-1 "the authorities are on to you."  According to Rossi, during the call between CC-1 and Rossi, CC-1 told Rossi for the

5

first time that the storage unit contained drugs, and asked Rossi to assist him in emptying the storage unit and disposing of its contents. According to ROSSI, he and CC-1 went to the storage unit early in the morning on March 21, 2007 and loaded the contents into Rossi's mother's car because it was the only vehicle large enough to accommodate the contents of the storage unit.[3]

ROSSI also informed the officers that he and CC-1 established an Internet poker website, www.blacklabelpoker.com, together. Agents, continuing their investigation, obtained documents showing that on or about June 27, 2006, Rossi, the defendant, at a post office located in Valley Cottage, New York, purchased two United States Postal Service ("USPS") money orders, each in the amount of $1000. On that same day, Rossi purchased an additional two money orders, in the same $1000 denomination, at a post office in the nearby town of West Haverstraw, New York. On that same day, Rossi purchased an additional two money orders, each for $1000, at a post office located in nearby Congers, New York. On that same day, Rossi purchased an additional two money orders, each for $1000, at a post office located in nearby West Nyack, New York. All ten money orders, for a total amount of $10,000, were made payable to "Celare Software," the California company that agents identified provided the hosting services for

---

[3] The interviewing officer's report and Rossi's written statement were both provided to the defense as Rule 16 discovery.

the Internet website www.blacklabelpoker.com.

Furthermore, agents obtained documents showing that on or about July 19, 2006, Rossi purchased an additional six USPS money orders in the amount of $1000, all payable to "Celare Software." Two of the money orders were purchased in Spring Valley, New York, two were purchased in West Haverstraw, New York, one was purchased in Tallman, New York, and one was purchased in Congers, New York.[4]

On February 26, 2008, a Grand Jury sitting in this District returned an indictment against Rossi charging him with a single count of maintaining drug-involved premises – the storage unit in Nanuet – in violation of Title 21, United States Code, Section 856(a)(2). CC-1 was indicted in this District for conspiring to distribute illegal anabolic steroids and for money laundering and pled guilty to both charges.

**ARGUMENT**

**I.        Defendant is Not Entitled to Dismissal of the Indictment Or To Inspection of Grand Jury Minutes**

The detailed factual allegations contained in the Complaint and the discovery provided to the defense, all of which, with the exception of the defendant's self-serving exculpatory statement that although he rented it in his name he

---

[4] Copies of the postal money orders were produced to the defendant as Rule 16 discovery.

had no idea what the storage unit contained, strongly suggest the defendant's guilt make the defendant's motion and its basis patently ridiculous.

Simply the evidence in defendant's possession pursuant to Rule 16 – without mentioning any other evidence – demonstrates that 1) Rossi leased the storage unit being used as a "conversion" lab in his own name, 2) accessed the lab on multiple occasions and therefore knew what it contained, 3) helped CC-1 attempt to dispose of the steroids and other equipment to avoid law enforcement detection, and 4) laundered the cash proceeds of illegal steroid sales by engaging in structured purchases of postal money orders to avoid triggering reporting thresholds.

Such evidence is, on its face, and without more, more than sufficient to establish probable cause.  Even if there were not overwhelming proof – which there is – there is nonetheless no basis in the criminal discovery rules for inquiry into the Grand Jury's procedures, and it is well-established that Grand Jury information is not subject to disclosure in the absence of specific allegations of governmental misconduct in the Grand Jury.

The defendant makes no specific allegation regarding the adequacy of the Grand Jury proceedings in this case.  Even had he done so, it is clear that indictments may not be challenged "on the ground that there was inadequate or

8

incompetent evidence before the grand jury." Costello v. United States, 350 U.S. 359, 408 (1956). Likewise, grand jury proceedings cannot be unsealed simply because the defendant presumes that the grand jury may have acted on incomplete evidence or incorrect legal instructions. United States v. Dunn, 2005 WL 1705303, at *2 (S.D.N.Y. July 19, 2005). "The secrecy of grand jury proceedings is fundamental to our criminal justice system." United States v. Carter, 2005 WL 180914, at *5 (S.D.N.Y. Jan. 25, 2005) (citing United States v. Proctor & Gamble Co., 356 U.S. 677, 682 (1958)). A party seeking disclosure of grand jury minutes must make a strong showing of "particularized need" that outweighs the need for secrecy. See United States v. Sells Eng'g, Inc., 463 U.S. 418, 442-43 (1983); United States v. Moten, 582 F.2d 654, 662 (2d Cir. 1978); Carter, 2005 WL 180914, at *5. The burden is on the defense to show a particularized need for disclosure, see Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400 (1959), and a "review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct," United States v. Torres, 901 F.2d 205, 233 (2d Cir. 1990). The same stringent standard applies both to in camera review and disclosure to the parties of grand jury minutes. Dunn, 2005 WL 1705303, at *1.

Accordingly, the defendant's request to dismiss the indictment and his attempt to gain discovery regarding the Grand

9

Jury should be summarily denied.

## II. **Defendant is Not Entitled to Further Discovery**

Defendant seeks pre-trial disclosure of various items, none of which he is entitled to, with the exception of materials pursuant to Brady v. Maryland, 373 U.S. 83 (1963).

### A. The Government Has No Brady Material

The Government is aware of its obligations under Brady and is complying with them. The Government is not aware of any Brady material currently in its possession, custody or control. To the extent that any such materials are discovered or received, the Government will produce them immediately.

Courts in this District routinely deny requests for discovery orders pursuant to Brady where, as here, the Government has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under Brady. See, e.g., United States v. Sanchez, 2003 WL 1900851, at *5 ("Brady establishes no general right to pretrial discovery, and gives rise to no pretrial remedies."); United States v. Greyling, 2002 WL 424655, *2; United States v. Savarese, 2002 WL 265153, *2 (S.D.N.Y. Feb. 22, 2002); United States v. Palermo, 2001 WL 185132, *1 (S.D.N.Y. Feb. 26, 2001). Accordingly, the defendant's Brady motion should be denied.

B.        The Defendant Is Not Entitled To Giglio Material

It is well-established that impeachment material ordinarily need not be disclosed until the witness is called to testify at trial. See, e.g., United States v. Nixon, 418 U.S. 683, 701 (1974) ("[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial"); United States v. Frank, 11 F. Supp.2d 322, 325 (S.D.N.Y. 1998) ("[C]ourts have approved disclosure of Giglio material on the day that a witness testifies."). The Second Circuit has held that a request for immediate or early disclosure of Giglio material has no basis in the law. See Coppa, 267 F.3d 132. As discussed above, in Coppa, the Second Circuit held that Brady and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant. Rather, the Government must disclose any Brady or Giglio material in sufficient time for the defense to make effective use of it. Coppa, 267 F.3d at 146.

As another court in this District noted in denying defendant's motion for the pre-trial disclosure of Giglio material:

> Giglio material is customarily produced in this District with Section 3500 material in recognition of the fact that this type of Brady material does not ordinarily require any independent investigation in order to use it effectively at trial. Consequently, neither the courts nor the parties in criminal cases have assumed that there is any

11

> pretrial right to disclosure of Giglio
> material. . . . Similarly, Congress has
> assumed that there is no pretrial
> constitutional right to disclosure of Giglio
> material. For instance, in amending 18
> U.S.C. § 3432 in 1994, Congress reaffirmed
> the requirement that the Government provide a
> witness list three days prior to trial in
> death penalty prosecutions. If Giglio
> material were required to be produced prior
> to trial "on demand", defense counsel would
> effectively have a witness list long before
> then, and this statutory provision would make
> little sense.

United States v. Jacques Dessange, Inc., 2000 WL 280050 at *9 (S.D.N.Y. March 14, 2000) (DLC). See also, United States v. Wilson, 2001 WL 727026 at *2 (S.D.N.Y. June 28, 2001) (early production of Giglio material not required); United States v. Pimentel, 2001 WL 185053 at *5 (E.D.N.Y. Jan. 22, 2001) ("Giglio material is properly disclosed just prior to the witness being called to testify at trial, or earlier if additional time is reasonably required to review the material"); United States v. Dacunto, 2001 WL 13343 at *7 (S.D.N.Y. Jan. 5, 2001) ("Jencks Act and Giglio material, which in this district are customarily produced at the same time, should be produced at least one day prior to the testimony of any witness to which such material relates"); United States v. Jones, 2000 WL 1448640 at *2 (S.D.N.Y. Sept. 28, 2000) (there is no requirement that Giglio information be produced before trial).

Following the usual practice in this District, the Government intends to produce Giglio material when it provides

12

prior statements of a witness pursuant to 18 U.S.C. § 3500 -- that is, the Friday before the trial is scheduled to begin, or, if additional time is reasonably required to review the material, sufficiently in advance of the witness' testimony to avoid delay of the trial.  Accordingly, the defendants' request for the immediate disclosure of Giglio material should be denied.

    C.    The Defendant Is Not Entitled To Jencks Act Material

The defendant seeks accelerated production of Jencks Act material.  As a threshold matter, this request is premature as the Government has not yet identified which witnesses it intends to call at trial.  In any event, the law is clear that the Government is under no obligation under the Jencks Act, 18 U.S.C. § 3500 et seq., to produce prior statements of its witnesses until after each has testified on direct examination.  As recognized by the Second Circuit, the statute governing production of Jencks Act material prohibits a district court from ordering the disclosure of statements of Government witnesses any time before their direct testimony at trial.  United States v. Coppa, 267 F.3d 132, 145 (2d Cir. 2001).

Title 18, United States Code, Section 3500 provides:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial

of the case.

18 U.S.C. § 3500(a) (emphasis added).

Notwithstanding the very limited obligations placed upon the Government, the Government intends to provide Jencks Act material (and Giglio material) no later than the Friday before the testimony of any witness, as is customary in this District. Where Jencks Act material for a particular witness is voluminous, the Government will attempt to provide such Jencks Act material further in advance to allow defense counsel to review it without any interruption in the trial. The defendants' motion for early production of Jencks Act material should therefore be denied.

### D. The Defendant Is Not Entitled to the Preservation of Rough Notes

The defendant moves for an order requiring all handwritten notes by law enforcement agents taken during the course of the investigation in this case to be preserved, regardless of whether or not the contents of such notes were incorporated into official reports. It is established law in this Circuit that the "Jencks Act, 18 U.S.C. § 3500, imposes no duty on the part of law enforcement officers to retain rough notes when their contents are incorporated into official records and they destroy the notes in good faith." United States v. Terrell, 474 F.2d 872, 877 (2d Cir. 1973). See also United States v. Elusma, 849 F.2d 76, 79 (2d Cir. 1988) ("[P]recedent in this circuit holds that [agents] need not preserve [handwritten

14

notes] if the agents incorporate them into formal reports."); United States v. Barlin, 686 F.2d 81, 92 (2d Cir. 1982); United States v. Anzalone, 555 F.2d 317, 321 (2d Cir. 1977); United States v. Covello, 410 F.2d 536, 545 (2d Cir. 1968); United States v. Jones, 360 F.2d 92, 95 (2d Cir. 1966); United States v. Ma, 2006 WL 708559, at *15-16 (Mar. 21, 2006 S.D.N.Y.); United States v. Fruchter, 104 F. Supp. 2d 289, 313-14 (S.D.N.Y. 2000).

    E.    The Defendant Is Not Entitled to Disclosure of Evidence Sought to be Admitted Pursuant to Rule 404(b)

The defendant also seeks that the Court order the Government to give him notice of its intention to use evidence of other crimes, wrongs or acts pursuant to Rules 404(b) and 609 of the Federal Rules of Evidence. However, the defendant identifies no special circumstances that would warrant early disclosure of this evidence. See United States v. Ojeikere, 299 F. Supp. 2d 254, 257 (S.D.N.Y. 2004). The Government has not yet determined what 404(b) evidence it may seek to introduce at trial. The Government will disclose the substance of prior bad acts, however, more than ten business days prior to trial – or earlier if the Court should so order – to permit the defendant an opportunity to challenge its admission and the Court to make an appropriate finding. See id.; see also Fed. R. Evid. 404(b) (requiring Government provide reasonable notice in advance of trial of the general nature of any such evidence it intends to introduce at trial); United States v. Perez, 940 F. Supp. 540,

553 (S.D.N.Y. 1996). Therefore, the defendant's request that the Court order such disclosure is moot.

### III. Defendant's Motion To Suppress Should Be Denied Without A Hearing

The defendant moves to suppress unidentified statements as "coerced" and "not voluntarily rendered." The defendant further argues that the statements – which remain unidentified – were given in violation of Miranda.

Even setting aside the fact that the discovery previously provided to the defendant demonstrates that 1) he reported to the police department voluntarily; 2) he was, in fact, read his Miranda warnings and waived them, 3) he made an oral statement to the officer, and then 4) made a written statement on a form explicitly stating that the statement was voluntary and that Rossi was not under arrest, the defendant's motion, which consists of three sentences, does not specify which statements are to be suppressed, and is not supported by an affidavit contradicting any of the record evidence demonstrating that Rossi's statements were voluntary and not made while he was in any manner of custody, is thoroughly inadequate as a matter of fact and law, and should be denied summarily.

**CONCLUSION**

For the foregoing reasons, defendant's motions are meritless and should be denied in their entirety.

Dated:   New York, New York
         June 23, 2008

                              Respectfully submitted,

                              MICHAEL J. GARCIA
                              United States Attorney


                     By:  ____/s/_____
                          JEFFREY A. BROWN
                          Assistant United States Attorney
                          Tel.: (212) 637-1110